in 19-4085, Estate of Dillon Taylor v. Salt Lake City are on the call. Mr. Garagos, can you hear me? I can hear you. Thank you. Good morning. This is Mark. Good morning. Thank you. Ms. Brabson, can you hear me? Yes, I can. Thank you. Thank you. Thank you, counsel. You may proceed. Thank you, Your Honor. This is Mark Garagos. Good morning. On behalf of the Estate of Dillon Taylor, I hate to distill down a case that has got so much briefing into a simple paragraph, but it strikes me in looking at this again and reliving this again in preparation for today's argument that the question is, was this an appropriate dismissal on a motion for summary judgment, making the finding that qualified immunity is here in the presence of not only a body cam, but actions such as the officer who did the shooting making a statement that he never saw the earbuds that were in the decedent's ears, when in fact we have unrebutted evidence that he not only saw them, but removed them and tossed them aside. We've got a deposition transcript where there was another officer present, actually more than one, who also was engaged with this young man and did not pull the trigger, even though he had his gun at low ready, and he testified under oath that he had the gun trained on this gentleman, and even after the supposed movements by my clients, he did not fire himself. I guess last year in the Eighth Circuit there was a similar case, except there was a gun, he was killed with a gun, and the argument there was on the dismissal that is very similar to what we're seeing here. The officers tell somebody to do something, in this case, show me your hands, show me your hands, show me your hands, as soon as the person complies with what the officer says, he gets shot and gets not once, but twice. In fact, ironically, if you take a look at the, and tragically, if you take a look at the coroner's report, the gunshot had grazed through, I believe, both gunshots through the hands, so he was actually showing his hands. There was no gun. The actions by the officer in trying to throw the buds away, the earbuds, or to the side or take them off, the fact that the other officer, whose name I struggle with. Also, Judge Lucero, I guess I had missed that, would you give us some detail on the last point you made, that is the buds being discarded? Yes, the buds were in the ears of Dylan, what I call earbuds, some people call them that. After he was shot and after he was approached, they were removed by the officer who did the shooting and they were tossed to the side. When he testified in the deposition, I believe it's in the transcript of the deposition that we attached, he said he hadn't even noticed them, and this was obviously afterwards. Thank you. This is Judge Holmes, good morning, I don't understand what that gets you. There are a number of facts that were in the district court's order by the district court's own admission that really are not material, it really doesn't matter. At the end of the day, the question is whether a reasonable officer would have felt that either he was in danger or the public was in danger at the time that your client was facing it. What difference does it make? Let's assume for the moment that he lied. So what? Go ahead. I didn't mean to interrupt, it's one of the perils of the telephone call. Well, only in this sense, because a reasonable officer, Exhibit A, is the other officer, the Andrew Silamuglu, who did not fire, and Andrew Silamuglu gave the reasons why he didn't fire. And the reasonable officer, there's yet a second officer besides, who did not fire. Let me interrupt you, this is Judge McHugh, Officer Saralucca said he was ready to fire, and that if Officer Cruz had not fired, that he would have. Am I remembering that wrong? Yeah, that's not exactly what he said. He said, and I believe it was at 544 to 546, probably something along those lines. So yes, from what I recall, he was equivocal at best in his testimony. And by the way, I think that's exactly why there is a material dispute in this case. You've got a situation, by the way, when they came there, that it was not a situation that needed to be escalated to this point. Well, I read your brief as conceding that this was not a voluntary encounter. I mean, I don't see anything in your brief where you're suggesting that we never even got to the level of reasonable suspicion, and your client had the right to just walk away. I didn't see that argument. Did you make it? Well, I think that we made it at the trial court level, but clearly there was, because all of the testimony as to whether or not they had used lights and sirens to approach the one officer, Mr. Andrew, as I'll call him, Andrew said, no, this was not a situation where he believed that he had to have it on, because there was no issue there. What they knew at the time, and when you say whether it was a reasonable approach or detention or anything else, the body cam tells it all. This officer drove up, jumped out of his car, immediately escalated this from zero to 100 in no time, told the guy, show me your hands. As soon as he showed the hands, he executed him, and that, I believe, is a material dispute for a jury to decide. It isn't for the district court to take it away. One of the other ... Salt Lake, somebody posted this on YouTube. I think it's had close to a million views. You'd be astonished that we're sitting here talking about it so antiseptically and clinically when virtually everyone who's viewed it views it and sees it as an execution. I understand that we're talking about qualified immunity, but that officer went out of that car. We've got the body cam. He went from zero to 100 in a matter of a fraction of a second. Whether the decedent had the right to walk away or not, when the decedent turned around and he was yelling at him to show his hands, there was another officer there who was also pointing the gun at him. I guess that was Andrew, Officer Andrew. At that juncture, yes, one could say he raised his hands and was executed, but on the other hand, he was talking to the officer. We don't know what he was saying, or at least I couldn't discern from the body cam what he was saying, but the reality is he did not just show his hands, he lifted his shirt. The question is, you alluded to the body cam early on. I'm not sure how the body cam helps you, because the body cam supports the notion that he lifted his shirt in a cross-way motion. How does that help you? To show that he wasn't, that he didn't have a weapon. Obviously, he says, show your hands. He's lifting his hands. He didn't have more than ... By my calculation, I tried it on my stopwatch. It's not admissible evidence, but I tried it on my stopwatch on my phone. I don't think that it was a fraction of a second between the time when he turned around, started to lift up his hands, and he was shot. In fact, you can tell by virtue of the coroner's report that where his hands were in relationship to the body and to the bullet's entry wound. I've watched it, as I'm sure you have, more than once. There's no way to make a determination as to what was happening there, and it certainly didn't call for shooting or executing him when you jumped out of the car and you'd been screaming at him to show your hands, show your hands. If this is qualified immunity, I don't understand that maybe 1983 doesn't mean anything anymore, because literally you're screaming at somebody to raise his hands or to show your hands. When asked in the deposition what he should have done, the other officer, Officer Andrews, said something to the effect of, he should have yelled back, I don't have a gun. I'm reaching my hands out. Well, I've had cases where when somebody tried to explain something, the officer said, I didn't ask you to talk. It becomes situational where anything goes. We can justify, I suppose, anything and make anybody have qualified immunity, but the body cam here, contrary respectfully to your saying it doesn't help the case, I don't think if this were in front of a jury, much more than the body cam and the officer's testimony, to show that this kid was essentially executed for no good reason. And I don't know why- Counsel, Judge Lucero, if I may, what is your client's race, Dylan Taylor? Hispanic, partial Hispanic. And I expected you to argue summary judgment and you did. It just, what comparison is there between the clothing that your client was wearing and the 9-11 dispatch that reported a man wearing a white shirt, red pants, and a red baseball cap? And you can see on the body cam that at least there's a white shirt or what appears to be a light shirt. I mentioned on the, and I guess for the same reason that I feel that the Facebook posts by my client are irrelevant, the city thinks that the inebriation of the 9-11 caller are irrelevant. But it's clear, based on the interview after the fact, that that call was, and you're the one who asked the question about race, it's clear that somebody was drinking some vodka, saw some kids, and made a call and was somewhat incoherent. Now the 9-11 transmission- What color pants was your client wearing? I can't really tell in that body cam. Well, it was black. I've got it up as we're speaking right now. I don't know that I would characterize what color the pants were or the cap from the pixelation of the video as I'm looking at it. I would tell you that there is, other than the video itself, the only other things obviously that we have is we've got a 9-11 caller, we've got the officers, and the two other kids who were there. I'm sorry. Go ahead, Denis. No, I was just, is there a material dispute in the description of the clothing that your client was wearing at the point of death and the description on the 9-11 call? I don't think that there's a question that there's a material dispute, because when he gets out of, the description was the baseball cap, the shorts, and everything else. When you take a look at the video, he's not wearing shorts. I wouldn't characterize what he's wearing as a shirt, and even though the sun is very bright, it does not look like there is a- Well, is that the only evidence in the record, the video? There's nothing in the record that tells us what he was wearing, or autopsy report, anything that tells us? Sure. We have the clothing, we've got the autopsy report, and none of the team's- I think my questions are rather straightforward and simple. What is the description of the clothing? Correct. The description of the clothing does not match the description by the 9-11 caller. Well, there's some similarities, right? The striped shirt that his brother was wearing, and I believe there was a red or pink cap. But I mean, I guess the question is, all of that, we reached the point where you have a report that there was a gun, and the officers are investigating that. Two of the three suspects are cooperative and don't have a gun, so the officer is concerned that the decedent had a gun. And unlike the other two, the decedent is not cooperative. And I listened, I watched it repeatedly, and I thought he said something like, no fool, or something like that to the officer when he's saying, show your hands, show your hands. But we have to look at it and whether a reasonable officer would have felt that he was justified in using deadly force because there was a risk that deadly force was going to be used against him. That's the critical question, isn't it? Correct. Regardless of how we got there. Correct. But the way you got there was taking a more robust view of the scene in retrospect. I hear the bell. This officer didn't know that the other two were compliant. He didn't know anything. He just drove up, jumped out, and had his gun pulled. Well, he saw them raise their hands. I mean, I can see that on the video. Right. But he doesn't know there's more than two people standing there. Well, it seems on the video that there were three people who were coming out of the 7-Eleven or whatever it was, who raised their hands when he pulls up. The third starts walking, and they immediately start going after the third. He's walking. Is that not what you think? What I see is when he drives up specifically at the point, and it is, all the evidence is that it's a 7-Eleven. It looks like he drives in. I do not believe there was anybody else in the car with him. There is a red truck that's on the side. There are at least three people there. There's another white minivan. There is... Absolutely. Judge Lucero, please be aware there are bells ringing in the background. I'm sorry. And there's another officer to the right, and the other officer testified. In the video, you can see the other officer. That's the one I've labeled as Officer Andrew. There was no communication between the two of them. That was testified by Officer Andrew. Officer Andrew, if these two... Thank you, counsel.  Okay. Correct, Judge. Okay. We'll hear from the appellee. Good morning. This is Catherine Brabson. I'm appearing on behalf of Officer Braun Cruz in Salt Lake City. May it please the court, Freda's entire argument is that a jury should decide if it was objectively reasonable for Officer Cruz to have used deadly force in this case. Counsel, Judge Lucero, what is our standard of review? Thank you, Your Honor. The standard of review in a qualified immunity case is that the plaintiff has the burden to show, based on the facts supported by the record, that there was a constitutional violation and that that violation is governed by some clearly established law. Do we look at the facts in the light? Excuse me. I'm afraid I'm responsible, probably, for our bad reception here. I switched mode on my phone. Just a second. Is that better? Yes. Yes, I can hear. Thank you. Is it correct that we look at the evidence in the light most favorable to the appellant? Your Honor, you look at the evidence in the light most favorable to the appellant. However... Thank you very much. Let me ask the question this way. You have three youths who are in the city of Salt Lake City acting lawfully. They've done nothing wrong. They're guilty of no crime. They are... Two of them, they're approached by the police. We can call it anything we want, but it's a voluntary appearance because these gentlemen are not committing crime, and the two of them stop. One of them keeps walking, has earbuds in his ear, obviously. And in the light most favorable to him, within seconds of the time that this gentleman is walking down the street, he is killed in cold blood. Now, I think, if you look at the facts, maybe I'm not a reasonable jurist. But if I look at this case in the light most favorable to the appellant, I cannot help but find a material dispute in the evidence that warrants a decision by a jury on a grant of summary judgment. I just don't see it. Now, you persuade me otherwise. Where is there no dispute in the evidence? The plaintiff doesn't match the description in terms of its physical appearance. Oh, he may look somewhat like him. Oh, sure. You can make a lot of arguments one way, but there are plenty of arguments that could be made on the other side, looking at the very same facts. You can look at the fact that this gentleman was fiddling with his pants, pulling them up. There's plenty of evidence he was pulling up baggy pants. There's plenty of evidence that he was listening to music or whatever he was listening to in his iPhone. You could just as easily explain the fact that he had his hands in his pockets or whatever to fiddle with his sound system as much as you can, that he was pulling guns. If there was some conduct on the part of the appellant of the deceased's estate, that he himself was brandishing guns, that he was engaging in some kind of misdemeanor or criminal activity, perhaps. But a jury is going to hear just the opposite from the estate. So maybe my colleagues are persuaded, but I am not, that there is a lack of a material dispute in the evidence on this case. So that's all I've got to say, and I'm ready to hear your argument. Thank you, Your Honor. Let me start with the question of reasonable, articulable suspicion. The precise dispatch was a report of a man with a gun, that the suspect flashed a gun as a complainant, but no threat was made. Male, Hispanic, wearing white shirt, red pants, red baseball cap, also another male, Hispanic, wearing a striped shirt. They were last seen southbound 200 East. Now that description does sound like it describes two individuals, but when the officer went to that location, he saw three individuals, one in a white shirt, one with red pants, and another one in a striped shirt. And so the fact that the description was somewhat crosswise, whether it was two people or three people, the officer could reasonably have believed that these three individuals, who were walking together, were the suspects described by the complainant. Now, I would also point out that the report from the complainant was that these individuals were looking for trouble. And while the suspect flashed a gun may or may not indicate a brandishing because there was no threat was made, it could also reasonably be interpreted as a nonverbal threat. And so the officer had reasonable articulable suspicion to stop these two individuals. The officer also got... So you're saying, this is Judge Holmes, so is your view they had a right to detain those three individuals? As a terrorist stop, Your Honor, simply to investigate whether or not there had been a crime committed. And as the district court noted, there may have been, in fact, Mr. Taylor would have turned out to be a person who was restricted from carrying a gun if he had been carrying a weapon, as was reported. They could have had, I think, open carrying a gun that was loaded. We don't know if a crime has been made. I would also point out that the contrary to the assertions of counsel, the reasonable suspicion argument was not made to the district court. It was not ruled on by the district court. It wasn't briefed or analyzed in any significant way in the briefing of this court. And in fact, there are things in the record that I might have referred to and pulled out if that was going to be the argument on appeal. Well, Judge Holmes said, so you didn't make that argument either, did you? In the district court? No, that argument has not been made and it wasn't ruled on in the district court. Well, then how can that help now? Because that argument has been weighed. It has not been briefed. And I don't think it's prudent for the court to exercise discretion to address it at this point when that's not all of the facts in the record about that situation. I apologize, Ms. Braxton, for talking over you. And this is Judge Holmes again. I want to be clear. I didn't recall there being any discussion about one way or the other about whether there was reasonable articulable suspicion to detain these individuals. And is that correct? In the district court, that issue was not brought up. That's correct. Okay. Well, if it wasn't brought up, then your argument now that there was a basis for them to detain the individuals is not particularly helpful either because that was not brought before the district court. So it shouldn't be able to help you either, right? Well, Your Honor, I don't think that whether or not we have the right to detain these individuals should be analyzed together with whether there was a use of excessive force or not. I think those are two separate issues. And there's case law on that point. Well, to Judge Lucero's point, if in fact, or his line of questioning, if in fact these are three individuals who are walking around in Salt Lake City, USA, not doing anything wrong, as far as we know, and there isn't reasonable articulable suspicion to detain them, why doesn't that make a difference? Because that means that the third individual, the decedent, had every right to tell that officer to turn around and walk away, didn't he? Well, again, you have to look at all of the facts leading up to this. The three individuals were walking together from the moment they were observed by Officer Cruz. And the complainant obviously felt that the situation was serious enough to phone 911. This was not a non-nefarious event from the point of the view of complainants. And by the way, there is no evidence in the record that Officer Cruz was given any information that the caller was tipsy or had been drinking or anything of that nature. I'm not even sure where that allegation comes from, but that's not something Officer Cruz was considering when he was considering whether to approach these three individuals. And obviously, Officer Cruz did ask the dispatcher if the caller had identified which of the individuals was flashing the gun, and the caller did not identify specifically which one. So the officer doesn't know which of these individuals may or may not have a weapon or had flashed it or had the legal right to possess that weapon. But Ms. Braxton, this is Judge Holmes again. If he had a right to turn around and walk away, and he did exercise that right to walk away, then help me to understand where the officer then had the right to shoot him. And specifically, I want to focus on the point that was raised by Mr. Geragos. What should he have done? I mean, if he had a right to walk away and the officer didn't have a right to detain him, then what should he have done in that situation to avoid getting shot? Well, a couple of things. He could have done what his companions did. He could have stopped and raised his hand. But once he began to walk away, you have to understand he had an interaction with Officer Soloroglu, where he essentially taunted him and dared him to shoot. He then, as he's walking down the sidewalk, if you look at the still photos, his hands stood out at his side. And then he goes from that position to concealing his hands, which is where he becomes a threat. I saw that, but let me stop you there. Is there any audio that you, because I've listened to the exhibit five, it's hard for me to make out what they're saying. You alluded to him saying to the officer, except for the officers, I guess you're relying then on the officer's deposition, that that's what he said, because I can't pick that up on the tape. So the way body cam works, Your Honor, is that the first 30 seconds, there is only video. There's no audio. And this tape is about 37 seconds. And so only the last seven seconds when you hear the beep, that's when the audio begins recording. And so it's only that last point that the audio is recording. What we know in terms of that interaction is that in the still photos, Mr. Taylor is walking down the sidewalk, you can see a motion that is, looks like he's pulling up his pants. When he gets off the end of the sidewalk, he turns around and it is undisputed that in response to their commands, he says, nah, fool, or perhaps what, fool, with a particularly definite meaning. I didn't get that from Mr. Garris at all. You're saying that's undisputed based on what? It's undisputed in the record on summary judgment. They did not dispute that Mr. Taylor said, nah, fool, when he turned around. That has never been disputed. So Mr. Taylor made a verbal response to Officer Cruz while he's looking at him. Again, which is why the facts are, that are relevant to determining whether it's objectively reasonable here. The material facts on that point are not in dispute. I would also correct Mr. Zaragoza on the record with respect to Officer Silleloge's testimony. He testified very clearly on pages 54 to 55 of his deposition that he had made the decision to shoot when he put his finger on the trigger. And that he's only done that, this is the only time in his 10-year career that he's ever put the finger on the trigger of his firearm. And when he's asked, if you were certain that Cruz doesn't pull the trigger, you would have pulled the trigger and everybody would have the same shares and everybody would be in different seats. And Officer Silleloge answers, yes. And so he had made the decision to shoot. Just like Officer Cruz, the suggestion that he was somehow more reasonable, he simply was in a different position than Officer Cruz. And so he did not have the straight on view, waited a brief moment, heard Officer Cruz's gun, and then sat down. I think... This is Judge McHugh, let me interrupt for a minute. Would you admit that there is a material dispute of fact about what Mr. Taylor was doing with his hands? Are you talking about when they were concealed or when he... Right before the shot. No, I did not agree that is the case. We know from the description... I'm sorry, go ahead. They argue that he was adjusting his pants and you dispute that that's what he was doing, right? Well, they argue that you should look at that video and see something inconclusive. Here's what Officer Cruz is facing. Officer Cruz has all of the circumstances leading up to that point, including the verbal interaction, which is contentious and defiant. And it's about three seconds after that, that we have the immediacy of the sudden movement where Mr. Taylor pulls his concealed hands, both of them at the same time, rapidly, suddenly without saying, hey, I'm going to stop. And by the way, he's walking backwards when he does that. All of that's on the video. So that's not all the evidence we have. We have the two descriptions from the officers. We know that Jarrell could not see what was happening because he was on the ground behind the red truck. We know that from the 7-11 video and also from his own testimony that he was on the ground and couldn't see what was happening. The last thing I would add is that we have that testimony of Adam who says, I can see why they thought he would have a gun. I think your time is running nine. I think the bells are ringing. But I wanted to just note one thing. As we look at this case, the light most able to the appellant, I think it would have been fair to say that Officer Silligo recalled the gentleman saying something like, what are you going to do? Shoot me? Your Honor, that's at a different point in time. That is when Mr. Taylor is just beginning to walk down the sidewalk and he comes out from around the red truck and he's looking. You can see in the still photos, he's looking to his right at Officer Silligo. That's the point where he actually he uses some expletives and says, what are you going to do? Come and shoot me, shoot me. And then as Mr. Taylor walks off the sidewalk and into the parking lot and turns around, Officer Cruz has been shot in the hand. And at that point, Mr. Taylor says, not cool. And that was heard on the body cam video. How much? How much time elapsed between the what are you going to do? Kill me in the time that he was killed? Second, seven or eight, maybe 10 seconds. Thank you, Counsel. Thank you. This time is the last case committed. Counselor excused.